## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CIPRIANI & WERNER, P.C., | Civil Action No. _____ |
| Plaintiff, | |
| v. | **Jury Trial Demanded** |
| AUROBINDO PHARMA LTD., | |
| Defendant. | |

## COMPLAINT

Plaintiff Cipriani & Werner, P.C. ("Cipriani") alleges as follows for its Complaint against Defendant Aurobindo Pharma Ltd. ("APL").

## NATURE OF ACTION

1. To avoid ruinous penalties and sanctions, an Indian pharmaceutical company, APL, made false promises of payment to its Pennsylvania law firm, Cipriani. In reliance on APL's false promises, Cipriani incurred more than $3.8 million in compensatory damages. Cipriani brings this action to be made whole for its losses and to hold APL accountable for its false promises.

2. APL manufactures the active pharmaceutical ingredient valsartan, a high blood pressure medication taken by millions of people in the United States. In 2018 and 2019, valsartan products were recalled due to the presence of a potential carcinogen. Dozens of products liability lawsuits followed, seeking damages from APL and other companies for injuries allegedly caused by valsartan. The actions were consolidated by the Judicial Panel on Multidistrict Litigation.

3. After delaying its appearance in the MDL for many months, APL was slow to comply with a special master's wide-ranging discovery requirements. In 2021, the plaintiffs filed a motion for sanctions seeking to strike APL's answer and all of its defenses.

4. At APL's direction, Cipriani led a massive, months-long document review and production effort. The review team included dozens of Cipriani attorneys, as well as contract attorneys engaged at the direction of APL. As a result of the herculean discovery effort, which APL touted and the special master acknowledged, APL defeated the plaintiffs' motion for sanctions.

5. When the time came for APL to pay Cipriani for its critical discovery work, however, APL refused. After months of back-and-forth, APL, through two successive general counsel, acknowledged the approval of a substantial portion of the outstanding amounts due to Cipriani. It went so far as to state repeatedly in late 2021 that payment would be forthcoming, and again in 2022 that the unpaid invoices would be addressed. More than a year later, though, APL still has not made any payments to Cipriani for its extraordinary discovery work on APL's behalf.

6. In this action, Cipriani seeks to recover more than $3.8 million in unpaid legal fees earned and reimbursement of expenses incurred on APL's behalf, as well as consequential damages stemming from APL's conduct. Cipriani also seeks punitive damages and attorney's fees for APL's fraudulently inducing Cipriani into paying for more than $1.5 million in contract attorney expenses on APL's behalf.

## THE PARTIES

7. Plaintiff Cipriani & Werner, P.C. is a Pennsylvania-based law firm. Cipriani attorneys Ernest Koschineg and Jessica Heinz, both licensed Pennsylvania attorneys based in Blue Bell, Pennsylvania, led Cipriani's representation of APL.

8. Defendant APL is a pharmaceutical manufacturer based in Hyderabad, India. APL manufactures, among other things, the active pharmaceutical ingredient valsartan. Following recalls of valsartan medications in 2018 and 2019, APL was sued in products liability actions across the United States.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a). Cipriani is a Pennsylvania professional corporation with its principal office in Pittsburgh, Pennsylvania. APL is incorporated and has its principal place of business in India. None of Cipriani's attorneys reside in India. The amount in controversy exceeds $75,000.

10. This Court has personal jurisdiction over APL because Cipriani's claims arise out of APL's purposeful contacts with Pennsylvania.

11. APL hired Cipriani, a Pennsylvania-based law firm, to perform legal services on APL's behalf. Cipriani sent an engagement letter to APL that featured Cipriani's office in Blue Bell, Pennsylvania on the letterhead. Cipriani attorney Jessica Heinz signed the engagement letter on Cipriani's behalf in Pennsylvania.

12. APL knew that Cipriani would perform most of its legal services for APL in Pennsylvania. Cipriani attorneys Ernest Koschineg and Jessica Heinz, who led Cipriani's representation of APL, are both Pennsylvania licensed attorneys based in Blue Bell, Pennsylvania. Both before and during the representation, Mr. Koschineg and Ms. Heinz were in

frequent contact via email and phone with APL representatives concerning the representation. Both Mr. Koschineg and Ms. Heinz list their Blue Bell, Pennsylvania office location in their email signatures.

13. Over the course of the nearly two-year engagement, Cipriani attorneys spent over 12,000 hours working for APL. More than 10,000 of those hours were billed by Cipriani attorneys based in Pennsylvania.

14. After APL refused to pay the millions of dollars that it owes Cipriani, Cipriani suffered injury in Pennsylvania and that injury is continuing.

15. Venue is proper pursuant to 28 U.S.C. § 1339(b)(1). A substantial part of the events giving rise to Cipriani's claims occurred in the Eastern District of Pennsylvania. Cipriani performed most of its work for APL in the Eastern District of Pennsylvania, and Cipriani's claims arise from APL's failure to compensate Cipriani for that work and related out-of-pocket expenses.

## FACTUAL BACKGROUND

**A.     APL is Sued in Valsartan Multidistrict Litigation, but Delays Appearance**

16. In 2018 and 2019, several manufacturers and distributors of drug products containing valsartan, a medication used to treat high blood pressure and other conditions, issued voluntary recalls due to the detection of small amounts of a potential carcinogen in valsartan products.

17. In short order, individuals across the country filed suits against manufacturers, distributers, and sellers of valsartan products, alleging personal injuries and economic losses. The plaintiffs claimed that valsartan medications were contaminated with cancer-causing chemicals. Their claims raised complex issues relating to the safety, testing, distribution, regulation, and recall of valsartan.

4

18. In February 2019, the Judicial Panel on Multidistrict Litigation consolidated the valsartan-related actions into a multidistrict litigation. Aurobindo Pharma USA, Inc. ("APUSA"), which distributes valsartan medications as APL's United States operating subsidiary, was named as a defendant. APL, which manufacturers the valsartan active pharmaceutical ingredient, was also named as a defendant.

19. APUSA promptly appeared in the litigation, hiring Cipriani to represent it. Cipriani worked diligently to fulfill APUSA's discovery obligations and to prepare its defense. Cipriani's invoices for its work defending APUSA were paid by APUSA's insurer, Ironshore.

20. APL, by contrast, avoided appearing for nearly a year. During this time, discovery progressed against other defendants and the cases were moving forward.

21. In February 2020, plaintiffs' counsel requested an entry of default against APL. At a status conference, the court stated that APL had "had enough time and this is their last chance" to appear and defend itself.

B. **APL Hires Cipriani for Defense**

22. Following the request for an entry of default, APL informed Cipriani that it wished to retain Cipriani to represent it in the litigation.

23. On February 10, 2020, Cipriani sent APL an engagement letter (the "Engagement Letter") for the Valsartan MDL matter. The Engagement Letter provided that Cipriani would defend APL in connection with the Valsartan MDL and bill for its services on an hourly basis ($235 per hour for partners and $195 per hour for associates). The Engagement Letter also provided that Cipriani could hire outside consultants in connection with the representation, with prior approval from APL.

24.     Unlike the APUSA engagement, in which Cipriani was appointed by an insurance carrier, APL's engagement of Cipriani was direct.  APL agreed to pay Cipriani for Cipriani's services and expenses within 30 days of receipt of Cipriani's invoices.

25.     At the time of the Engagement Letter, it was unknown how much work would be required to defend APL and, in particular, the scope of potentially discoverable documents was unknown.  Accordingly, Cipriani made no estimate as to the overall cost of the Valsartan MDL defense for APL.  As explained in the Engagement Letter:

> You acknowledge that we have not made any guarantees with regard to the ultimate outcome of this engagement, how long it will take to achieve an outcome or the total amount of fees, costs, charges and expenses which will be incurred. . . .

26.     On February 14, 2020, APL representative Hunter Murdock, then the general counsel of APUSA, signed the Engagement Letter.  General Counsel Murdock acted on APL's behalf throughout the representation and was the direct APL contact for Cipriani attorneys.

**C.     Cipriani Begins Work**

27.     On February 25, 2020, Cipriani attorney Jessica Heinz entered her appearance for APL.  Shortly thereafter, Cipriani attorney Ernest Koschineg did the same.

28.     Cipriani quickly got to work for APL.  By June 30, 2020, the firm had reviewed tens of thousands of documents and produced more than 31,000 pages of core discovery material.

29.     On August 25, 2020, Cipriani wrote to plaintiffs' counsel regarding an electronic discovery plan.  Based on discussions with General Counsel Murdock and APL, Cipriani proposed five APL custodians for whom APL would produce electronically stored information.  Plaintiffs' counsel ignored Cipriani's proposal for months.

30. Meanwhile, Cipriani prepared to take and defend upcoming depositions. Mr. Koschineg and Ms. Heinz were in frequent communication with General Counsel Murdock regarding strategy and preparation for the depositions.

31. During the first year of the engagement, APL paid Cipriani for its services rendered at the agreed upon rates in the Engagement Letter.

**D.    Plaintiffs Insist on Wide Ranging E-Discovery, and Special Master Allows It**

32. On February 19, 2021, the plaintiffs responded to APL's e-discovery proposal. The plaintiffs requested production of electronically stored information for 15 custodians within one month—by March 12, 2021.

33. APL vigorously opposed the majority of the plaintiffs' proposal. Through its counsel at Cipriani, APL argued that the proposed 15 custodian collection and production was unduly burdensome and unreasonable.

34. On February 24, 2021, the court-appointed special master, Judge Thomas Vanaskie, sided with the plaintiffs. Judge Vanaskie ordered APL to produce documents and electronically stored information for 15 APL custodians, plus additional documents, by March 19, 2021 (the "Discovery Order").

35. The Discovery Order necessitated a massive undertaking, ultimately requiring APL to produce and its counsel to review millions of documents for production to the plaintiffs. Judge Vanaskie warned that "this needs to be done and we have a schedule." The schedule was ultimately extended by several weeks, resulting in Cipriani reviewing more than 10 million documents between the date of the Discovery Order and Cipriani's completion of APL's document production in June 2021.

**E.     APL Directs Cipriani To Conduct Massive Document Review**

36.    Cipriani informed APL of the Discovery Order on the same day it was issued. To enable APL to comply with the Order, Cipriani requested that APL promptly send the 15 custodial files subject to the Order. Custodial files included all electronically stored information (including emails, documents, presentations, and archival data) from the specified individuals. By the time of the Discovery Order, Cipriani had received files for only two of the 15 custodians.

37.    To comply with the Discovery Order, APL and Cipriani had to (1) collect the entire set of electronic documents for each custodian; (2) run agreed search terms across that document universe; and (3) review the documents returned by search results for responsiveness and privilege.

38.    Cipriani was clear with APL about the enormity of the discovery task it was confronting. In an email dated February 24, 2021, Ms. Heinz told General Counsel Murdock that, for just the two custodians whose documents had been transferred to Cipriani, "search terms hit on over 400,000 documents." Ms. Heinz explained that Cipriani had "assembled a team of 15 attorneys" to review these documents.

39.    Due to the size and scope of the document review project, Cipriani recommended that APL also consider enlisting the support of contract attorney reviewers. On February 25, 2021, Ms. Heinz provided General Counsel Murdock with a rough contract attorney estimate for the 470,000 or so documents that Cipriani had at that time. Based on billing information provided by a contract attorney vendor, Cipriani estimated that the cost of review and production of the documents then in its possession would exceed $550,000. Ms. Heinz also made clear that this was only a fraction of the entire review called for by the Discovery Order, explaining: "Once all the data is loaded, I think it's possible we could be looking at 3 million documents for review."

40. APL realized it would be costly to comply with the court's discovery order, but it had no other choice. On a phone call on or around February 26, 2021, General Counsel Murdock directed Cipriani to engage contract attorneys to assist with the court-ordered production.

41. In reliance on APL's directive, Cipriani immediately engaged a team of contract attorneys. Cipriani fronted the cost with the understanding that the client who was directing the work, APL, would reimburse Cipriani. The Engagement Letter did not require Cipriani to hire contract attorneys, and, but for APL's direction, Cipriani would not have done so.

42. On February 26, 2021, General Counsel Murdock requested that Cipriani set up a weekly recurring meeting with him to discuss "the status of the matter." Mr. Koschineg and Ms. Heinz readily complied, keeping APL closely apprised of the challenges presented by the massive, fast-paced review and progress on the production over the following months.

F. **Cipriani Meets APL's Discovery Demands**

43. As APL sent more custodial files to Cipriani, the demands on Cipriani to review files and produce relevant documents by the court-imposed deadlines grew. What started as 400,000 documents quickly ballooned into millions of documents.

44. To keep up with the accelerating pace of the document review, Cipriani was required to enlist as many attorneys as it could from across the firm and increase the number of contract attorneys. As Cipriani represented to Judge Vanaskie at a status conference on March 10, 2021, Cipriani was "working feverishly" to review the files and get the documents produced.

45. Cipriani remained in close contact with APL. In addition to the weekly attorney-client meetings discussed above, Ms. Heinz, Mr. Koschineg, and General Counsel Murdock communicated frequently by email. Through these regular communications, APL was fully aware of the massive effort that Cipriani was engaged in on APL's behalf, and General Counsel Murdock had direct access to the discovery data and vendors.

46. In an email dated March 11, 2021, for example, Ms. Heinz informed General Counsel Murdock that "hundreds of attorneys" are reviewing "over a million documents [that] have been collected so far."

47. By the end of March, Cipriani had completed the document review and production of eight out of 15 custodians subject to the Discovery Order. Approximately 65 Cipriani attorneys and 70 contract attorneys had spent over 11,000 hours reviewing and analyzing APL documents in connection with the production.

48. For most of March, files for the other seven APL custodians remained with APL in India. APL claimed that the files were too large to send electronically. General Counsel Murdock sent hard drives to India for APL to use to transfer the data, but the hard drives got stuck in customs in India.

49. Cipriani explained this delay to the plaintiffs and Judge Vanaskie at status conferences throughout March, but the plaintiffs were unsatisfied. Ultimately, Judge Vanaskie ordered APL to send the files electronically, which, by the end of the month, APL did.

50. When the files finally arrived, Cipriani had millions of more documents to review. Cipriani worked as quickly as possible to get the remaining documents produced.

51. At a status conference on March 31, 2021, Judge Vanaskie acknowledged the enormity of Cipriani's task and encouraged Cipriani to keep at it:

> Yes, I know it's a Herculean task that you're facing and I also know we've got deadlines that are looming that will come up very fast. All I can say at the present time is urge you to continue to work as hard as you can to get these documents produced. I know you will.

52. Consistent with Judge Vanaskie's urging, and at APL's further direction, Cipriani continued to work as hard as it could.

G. **Based on Cipriani's Extraordinary Efforts, APL Avoids Sanctions**

53. While the document production was underway, on April 23, 2021, plaintiffs' counsel filed a motion for severe sanctions against APL. The motion focused in part on APL's delay in transferring custodial files from India, preventing the timely disclosure of those documents. Plaintiffs' counsel requested that APL's answer and defenses be stricken.

54. Faced with such stark potential consequences, Cipriani, at APL's direction, further accelerated its pace of document review and production.

55. In an email to Ms. Heinz on April 24, 2021, General Counsel Murdock not only acknowledged the daunting task ahead of Cipriani, but encouraged Cipriani to work faster. General Counsel Murdock wrote, "It looks like we have more than a million APL docs to review. Do we have a timeline for closing that out?"

56. Cipriani attorneys worked around the clock to complete the document production. APL relied on the efforts of Cipriani when it explained to the Court in opposing the sanctions motion that "hundreds of attorneys have spent over 45,000 hours reviewing documents collected for production." Referring to the Cipriani and contract attorney work that it directed, APL claimed that it had "devoted extensive resources to meeting their production obligations."

57. At the sanctions hearing, APL reiterated that it had expended "enormous efforts and resources" in collecting, reviewing, and producing documents and added that it was "working hard" and "devoting the resources necessary" to complete the production as fast as possible.

58. Cipriani ultimately reviewed over 10 million documents for APL from March through June 2021. As Cipriani was nearing the end of the review, Judge Vanaskie denied the plaintiffs' motion for sanctions, reasoning that "Aurobindo has continued to make additional

11

productions and supplement previous productions," thereby supplying the plaintiffs with the documents they requested.

59. APL, fully aware of the time and effort Cipriani devoted to the litigation, expressed no contemporaneous concerns over the scope and pace of Cipriani's work. To the contrary, APL encouraged it.

H. **APL Delays Payment to Cipriani**

60. Cipriani sent numerous invoices to APL over a period of months memorializing its time and expenses in detail.

61. In documents and invoices sent to APL concerning document review, Cipriani detailed which attorney reviewed which specific range of documents from which custodian and for how long.

62. APL asked for supporting information regarding the invoices, which Cipriani provided. Even after Cipriani provided the requested supporting information, APL did not make payment.

63. For months, Cipriani engaged in a back-and-forth with APL over its bills, reasonably believing that APL was proceeding in good faith.

64. During these discussions, and without receiving any payment, Cipriani continued to represent APL diligently. Cipriani attorneys spent hundreds of additional hours preparing for and attending depositions; working with experts; and drafting motions and other court filings.

65. APL currently owes Cipriani $3,854,843.78, as detailed below:

| Fees and Expenses Owed to Cipriani by APL | | |
|---|---|---|
| Fees | | |
| March 2021 | 3,327.5 hours | $730,925.50 |
| April 2021 | 2,556.7 hours | $563,132.50 |
| May 2021 | 1,690.7 hours | $365,088.00 |
| June 2021 | 691.2 hours | $151,689.00 |
| July 2021 | 435.2 hours | $95,949.00 |
| August 2021 | 386.2 hours | $85,193.00 |
| September 2021 | 404.7 hours | $86,283.50 |
| October 2021 | 429 hours | $93,002.50 |
| November 2021 | 405.9 hours | $86,324.50 |
| December 2021 | 293.2 hours | $62,358.50 |
| Expenses | | |
| Contract Attorney Vendors | Advanced Costs | $1,534,897.78 |
| Total | | |
| Fees & Expenses | | $3,854,843.78 |

I. **APL Promises to Make Certain Payments, But Fails Even To Do That**

66. In December 2021, after months of negotiation, APL informed Cipriani that most of its invoices had been "approved" for payment.

67. Specifically, APL "approved" the invoice for contract attorney vendors, as well as the invoices for legal services rendered after the discovery period, from July 2021 onward. In an email dated December 9, 2021, General Counsel Murdock told Cipriani that he had "put all the expense invoices and most of the time invoices through for payment" to an accounts payment team in India.

68. Shortly thereafter, General Counsel Murdock abruptly left APL without any notice to Cipriani. APL replaced General Counsel Murdock with Amy Farris Wolfe.

69. In an email dated December 28, 2021, General Counsel Wolfe affirmed that APL had "agreed to pay" the approximately $1.5 million in contract attorney expenses. And in an email the next day, December 29, 2021, she represented that APL had approved an "additional $419k in invoices" for services rendered in the Fall of 2021.

70. In August 2022, nearly a year later and still without payment, Cipriani sent a representative to India to meet with Mr. K. Nityananda Reddy, APL's Vice Chairman and Managing Director. Mr. Reddy told Cipriani's representative that APL would promptly address the unpaid invoices.

71. Despite APL's repeated representations that payment would be forthcoming, Cipriani has, to this day, not received payment or reimbursement of its out-of-pocket expenses for any of the more than $3.8 million in unpaid invoices.

72. Without payment of the more $3.8 million that it is owed, Cipriani has been forced to forego opportunities in hiring and acquisitions, as well as to delay share ownership, divestiture programs, and other business initiatives.

## CLAIMS

### Count I - Breach of Contract

73. Cipriani incorporates by reference the allegations in the preceding paragraphs, as if set forth fully herein.

74. The Engagement Letter is a valid and enforceable contract to which Cipriani and APL are parties. The Engagement Letter specifies that APL will pay Cipriani for the legal services it renders, and other costs and expenses it incurs, in connection with representing APL in the Valsartan MDL.

75. Cipriani rendered legal services and incurred costs in connection with representing APL in the Valsartan MDL.

76. APL breached the Engagement Letter by, among other things, failing to provide timely payment to Cipriani for legal services rendered and costs incurred in connection with Cipriani's representation of APL in the Valsartan MDL. APL failed to pay Cipriani for legal

services rendered from March through December 2021.  APL also failed to reimburse Cipriani for Cipriani's advanced expenses in hiring contract attorneys to assist with court-ordered document review and production.

77. Cipriani has been damaged in an amount not less than $3,854,843.78 as a direct and proximate result of APL's breach.

### Count II - Quantum Meruit

78. Cipriani incorporates by reference the allegations in the preceding paragraphs, as if set forth fully herein.

79. Cipriani, acting in good faith, provided APL with the benefit of legal and other services in the Valsartan MDL.  Cipriani attorneys spent over 10,000 hours rendering legal services on APL's behalf in the Valsartan MDL from March through December 2021.  Cipriani further paid $1,534,897.78 to hire contract attorneys to assist with its defense of APL.

80. APL appreciated the benefit of Cipriani's legal and other services.  Among other things, APL avoided the imposition of severe sanctions due to Cipriani's diligent work through a demanding discovery schedule.

81. APL accepted and retained the benefits of Cipriani's legal and other services.

82. Under the circumstances, it would be inequitable for APL to retain the benefit of Cipriani's legal and other services, unless APL pays Cipriani an amount not less than $3,854,843.78, representing the value of Cipriani's legal services and expenses.

### Count III - Unjust Enrichment

83. Cipriani incorporates by reference the allegations in the preceding paragraphs, as if set forth fully herein.

84. Cipriani, acting in good faith, conferred a benefit on APL by providing legal and other services to APL in the Valsartan MDL. Among other things, Cipriani spent thousands of hours rendering legal services on APL's behalf and over $1.5 million in out-of-pocket expenses to hire contract attorneys on APL's behalf.

85. APL appreciated the benefit of Cipriani's legal services and expenses in hiring contract attorneys. Among other things, APL met its production demands in the Valsartan MDL and avoided the imposition of severe sanctions.

86. Under the circumstances, it would be inequitable for APL to accept and retain the benefit of Cipriani's services without paying Cipriani an amount not less than $3,854,843.78, representing the value of the benefits APL appreciated.

## Count IV - Fraud

87. Cipriani incorporates by reference the allegations in the preceding paragraphs, as if set forth fully herein.

88. APL fraudulently induced Cipriani into hiring contract attorneys in connection with Cipriani's defense of APL in the Valsartan MDL. APL was a reluctant participant in the Valsartan MDL, and, faced with no other option but to engage in a demanding discovery process or risk ruinous sanctions, APL decided to mislead Cipriani about its intention to pay for the contract review expenses.

89. APL falsely represented to Cipriani that it would pay for the expense of hiring contract attorneys when, on or around February 26, 2021, APL directed Cipriani to hire contract attorneys to assist with the court-ordered document production. As the volume of work picked up through March, April, May, and June of 2021, APL continued to falsely represent that it

16

would pay for the expense of hiring contract attorneys by directing Cipriani to incur additional expenses and take on additional work on its behalf.

90. APL never intended to pay Cipriani for hiring contract attorneys. When APL directed Cipriani to hire contract attorneys or around February 26, 2021, APL did not intend to pay Cipriani for the expense of doing so. Likewise, when APL continued to direct Cipriani to engage in substantial discovery work and incur expenses throughout March, April, May, and June of 2021, APL had no intention of paying Cipriani for its work or expenses.

91. APL's lack of intent to pay Cipriani for its contract attorney expenses is demonstrated by, among other things, APL's failure to pay Cipriani despite having acknowledged what it owes. In December 2021, APL representatives admitted that Cipriani incurred over $1.5 million in contract attorney expenses on APL's behalf, and that APL owes Cipriani that amount. Yet almost two years after Cipriani incurred its contract attorney expenses, Cipriani's contract attorney invoice remains unpaid. The most plausible explanation for APL's lack of payment is that APL never intended to pay Cipriani from the start.

92. With its false representations, APL intended to induce Cipriani to incur expenses and provide services to save APL from ruinous sanctions.

93. Cipriani justifiably relied on APL's false representations. Among other things, Cipriani paid $1,534,897.78 to vendors for the assistance of dozens of contract attorneys, as directed by APL.

94. Cipriani would not have advanced the payments for the contract attorneys and incurred such substantial out-of-pocket expenses but for APL's false representations.

95. Cipriani has suffered damages as a direct and proximate result of APL's false representations.

## Count V - Account Stated

96. Cipriani incorporates by reference the allegations in the preceding paragraphs, as if set forth fully herein.

97. Cipriani maintained a running account with APL. Cipriani routinely sent APL written invoices describing Cipriani's services rendered, the nature of the services performed, and the amount charged for those services. When applicable, the invoices also set out the nature and amount of costs, charges, and expenses incurred in connection with the representation.

98. A balance of $3,854,843.78 remains due.

99. Cipriani has provided its invoices and statement of account to APL.

100. APL has assented in writing to owing Cipriani $1,534,897.78 for reimbursement for contract attorney expenses in the Valsartan MDL.

101. APL has assented in writing to owing Cipriani approximately $419,000.00 for legal services rendered from late Summer 2021 through Fall 2021 in the Valsartan MDL.

102. APL has assented through its conduct to owing Cipriani $62,358.50 for legal services rendered in December 2021 in the Valsartan MDL. For months after receiving Cipriani's invoice for services rendered in December 2021, APL posed no objection to the invoice.

103. Based on the account stated, Cipriani has been damaged in an amount not less than $2,016,256.28.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Cipriani demands judgment against Defendant APL as described below:

a)  For compensatory damages, in an amount to be proven at trial, not less than $3,854,843.78, representing the value of Cipriani's uncompensated services and expenses advanced in defending APL in the Valsartan MDL,

b)  For consequential damages, in an amount to be proven at trial, representing the value of costs incurred and opportunities lost as a result of APL's actions,

c)  For punitive damages as permitted by law,

d)  For attorneys' fees and costs and expenses incurred in this action,

e)  For prejudgment and post-judgment interest as permitted by law, and

f)  For such other relief as the Court may deem just and proper.

## JURY DEMAND

Cipriani hereby demands a trial by jury on all claims and issues triable to a jury.

Date:   January 10, 2023

Respectfully submitted,

**CIPRIANI & WERNER, P.C.**

By: *Anthony W. Hinkle*
    Anthony W. Hinkle (Bar No. 49702)
450 Sentry Parkway Suite 200
Blue Bell, PA 19422
610.567.0700
ahinkle@c-wlaw.com

**COVINGTON & BURLING LLP**
Benjamin J. Razi (*pro hac vice* app. forthcoming)
Marianna F. Jackson (*pro hac vice* app. forthcoming)
Noah H. Resnick (*pro hac vice* app. forthcoming)
One CityCenter
850 Tenth Street NW
Washington, D.C. 20001
202.662.6000
brazi@cov.com
mjackson@cov.com
nresnick@cov.com